The Chicago & Grand Trunk Railway Company v. John E. Miller and William L. Bancroft, and Same v. James H. Haslett and William L. Bancroft.

[Two cases.]

*Railroad companies—Fraud in organization—Estoppel.*

The receiver of a railroad company, in order to secure the construction of a connecting link in its projected line of road, organized another company, which organization he kept in his own hands, and contracted with the new company for the construction of its road, and was to receive as payment all of its bonds, and all of its stock except 25 shares, and all notes and subscriptions to its capital stock that had been or might be made, as donations or otherwise, to the company to aid in building its road. The contract provided that, unless the company procured the necessary right of way on or before a certain date, the receiver might, at his option, procure it, and he was to be paid at the rate of $1,000 per mile for all right of way secured. The contract made no provision for fencing the road, or for side tracks, switches, semaphores, water-tanks, station-houses, freight-sheds, nor for any of the appointments required by the general railroad law, and without which the road could not be operated. The receiver performed the contract, and was paid as provided for therein. He also procured the right of way, and performed the work not provided for in the contract, as hereinbefore specified, under authority from the individual members of the board of directors, who agreed that he should be paid therefor. After operating the entire line of road for a short time, the stock and bonds were sold to a third party, who assumed the control of the road, and some time afterwards the two companies were consolidated into a new company. Nothing appeared on the books of the company organized by the receiver showing any indebtedness to him for procuring the right of way, or for the other work done by him not covered by his contract, and the purchaser of the stock and bonds, as also the parties interested in the consolidation of the two companies, had no notice or knowledge of any claim by the receiver for such

indebtedness, and from the representations made by him they were led to believe that no such indebtedness existed. The receiver assigned the several claims, and the assignees sued the consolidated company for their collection; whereupon the company filed bills to enjoin the prosecution of the suits. And in affirming decrees perpetually enjoining such prosecution, the Court hold:

·a—That the whole scheme of the receiver in organizing the company was intended as a fraud upon the statute authorizing the organization of railroad companies.

b—That the complainant is not estopped from inquiring into it, under the circumstances of this case, for the reason that the purchaser of the stock and bonds had no notice or knowledge, at the time of his purchase, of the claims now sought to be enforced, and no such claims were made by the receiver to the parties interested in the consolidation of the two companies and the formation of complainant company.

c—That in equity the receiver has been more than paid for all labor and money expended by him, including the claims sought to be enforced.

d—That the assignees occupy no better position than the receiver, and should be estopped from prosecuting the claims by reason of the aforesaid representations; the stockholders of complainant company having apparently purchased in good faith, and without any knowledge or notice of the claims sought to be enforced, and after an examination of the books of the company, and after repeated assurances by the receiver that the right of way was fully paid for, and that there was no indebtedness against the company except for current expenses.

Appeal from St. Clair. (Canfield, J.) Argued February 4 and 5, 1892. Decided April 8, 1892.

Bill to enjoin the prosecution of two suits at law. Defendants appeal. Decrees affirmed. The facts are stated in the opinion.

*Isaac Marston* (*E. W. Meddaugh, Otto Kirchner,* and *H. Geer,* of counsel), for complainant.

*O'Brien J. Atkinson* (*Benton Hanchett,* of counsel), for defendants, contended:

1. In order to an estoppel, Bancroft must be found to be in the position towards the purchasers of the bonds and stock, or towards the parties engaged in the consolidation of the companies, such that a duty fell upon him towards them to notify them of his claims, and it must appear that he failed to notify them, and that they as purchasers made their purchase, or as railroad companies made their consolidation, when in fact they would not have purchased or consolidated had they known of these claims. Without these essential facts there can be no estoppel, and in order that the court can declare that there is an estoppel such facts must be made clearly to appear; citing 1 Greenl. Ev. §§ 204, 207; 2 Herm. Estopp. 944–946, 949, 950, 966; Big. Estop. 473, 480, 560, 600; *Maxwell v. Bridge Co.*, 46 Mich. 278, 41 Id. 453; and the facts which constitute an estoppel must be distinctly alleged by the party seeking to avail himself of it, and must be clearly established by the evidence; citing *Fredenburg v. Church*, 37 Mich. 476; *Maxwell v. Bridge Co.*, 41 Id. 453.

2. There is no evidence in the case that any sum whatever was paid for the stock and bonds by Hickson. He and the stockholders of the Grand Trunk Railway Company, in whose behalf he says he obtained the stock and bonds, stand in the position they would if the stock and bonds had been given to them. They were not *bona fide* purchasers. Proof of actual payment of value is necessary to be made in all cases in order to sustain the claim and build up any rights upon the character of a *bona fide* purchaser; citing 2 Herm. Estop. § 797; *Dixon v. Hill*, 5 Mich. 404; *Kohl v. Lynn*, 34 Id. 361; *Haescig v. Brown*, Id. 503; *Webster v. Bailey*, 40 Id. 641.

3. There is no evidence of any kind that Hickson or the stockholders of the Grand Trunk Railway Company have surrendered the stock and bonds, or any portion of them, to the complainant, or received from it any stock or bonds therefor. The parties who own the Chicago & Northwestern Railroad Company stock cannot be treated as having the rights of stockholders in the complainant company. They are not to be considered in this case; citing 1 Ror. R. R. 602; *Railroad Co. v. Railroad Co.*, 53 Penn. St. 20, 61, 62.

4. If there was in fact an estoppel by reason of the conduct of Mr. Bancroft, it is as complete a defense to the actions at law sought to be enjoined as it would be in chancery, and a bill in chancery cannot be sustained for the purpose of making such a defense; citing *Barnard v. Seminary*, 49 Mich. 444; *Vanneter v. Crossman*, 42 Id. 465; *Dann v. Cudney*, 13 Id. 239; 2 Herm. Estop. § 787.

5. The question of the regularity of the proceedings for the incorporation of the company can only be raised in behalf of the State, by proceedings taken on the part of the State; citing 2 Mor. Corp. §§ 743, 750, 752–754, 757; *Railroad Co. v. Cary*, 26 N. Y. 75; *Eaton v. Aspinwall*, 19 Id. 119; *Aspinwall v. Sacchi*, 57 Id. 331; *Railroad Co. v. Kyle*, 64 Id. 185; *Manufactory v. Davis*, 14 Johns. 237; *Swartwout v. Railroad Co* , 24 Mich. 389; *Bank v. Stone*, 38 Id. 779; *Wilcox v. Railroad Co.*, 43 Id. 584; *Railroad Company v. Johnson*, 55 Id. 456; *Franklin v. Twogood*, 18 Iowa, 515; and a corporation *de facto*, entering into a contract, cannot defend against its undertakings on the contract by itself setting up the defense that it was not lawfully organized; citing 2 Mor. Cor. § 752; *Dooley v. Glass Co.*, 15 Gray, 494; *Manufacturing Co. v. Stuart*, 46 Mich. 482.

6. The contract made with Mr. Bancroft for the construction of the road was one proper and competent to be made. The issue of the stock of railroad companies to pay for the construction of their railroads, and to acquire their various kinds of property, is not only common and notorious in practice, but is fully sanctioned by the decisions of the highest authorities; citing Cook, Stock, §§ 15, 17; Ang. & Ames, Corp. §§ 590, 590*a*; *Van Cott v. Van Brunt*, 82 N. Y. 535; *Fogg v. Blair*, 139 U. S. 118; How. Stat. § 3409; and a stockholder may contract with a corporation as freely as a stranger; citing *Van Cott v. Van Brunt*, 82 N. Y. 535; *Mickles v. Bank*, 11 Paige, 118; *Insurance Co. v. Manufacturing Co.*, 97 Ill. 537; *Gillett v. Bowen*, 23 Fed. Rep. 625; *Porter v. Steel Co.*, 120 U. S. 649.

7. The contract was properly executed by the corporation, and was approved by the board of directors, and was not at any time dissented from by any of the stockholders. It was open and known to all, and was fully carried out upon Bancroft's part. Under these facts, neither the Chicago & Northeastern Railroad Company nor its stockholders could complain of it; citing Cook, Stock, §§ 682, 684, 686; *Blocking Co. v. Machine Co.*, 90 N. Y. 607; *Kelley v. Railroad Co.*, 141 Mass. 496; *Hotel Co. v. Wade*, 97 U. S. 13; *Richardson v. Welch*, 47 Mich. 309; 1 Mor. Corp. §§ 261, 262, 290.

8. If the validity of the contract could be affected by the relation which Bancroft bore to the corporation when the contract was made, and the price agreed to be paid was more than the work to be done was worth, these facts would not render the contract void, but only voidable, and whether it should be treated as void or not rests in the election of the Chicago & Northeastern Railroad Company, or its stockholders. If they assented to it, knowing all the facts in relation to it, or if, being informed of these facts, did not, within a reasonable

time, object to the contract, they would be held to have elected to ratify it, and thereby it became valid as to them; citing 1 Mor. Corp. §§ 261, 262; *Richardson v. Welch,* 47 Mich. 309; *Craig v. Bradley,* 26 Id. 353; *Oil Co. v. Marbury,* 91 U. S. 587; *Hotel Co. v. Wade,* 97 Id. 13; *Thomas v. Railroad Co.,* 109 Id. 522; *Rolling Mill v. Railroad Co.,* 120 Id. 256; *Stewart v. Railroad Co.,* 38 N. J. Law, 522; *Kelley v. Railroad Co.,* 141 Mass. 496.

9. Upon the claim for an accounting, the question here is of the right of the Chicago & Northeastern Railroad Company itself, or its stockholders, to call upon Bancroft to account for the difference between the par value of the stock and what he paid the company for it, and such claim cannot be sustained; citing Cook, Stock, §§ 38-40; *Scovill v. Thayer,* 105 U. S. 143; *Foster v. Seymour,* 23 Fed. Rep. 65; *Van Cott v. Van Brunt,* 82 N. Y. 535; *Railroad Co. v. Tiernan,* 37 Kan. 606; *Coit v. Amalgamating Co,* 119 U. S. 343; *Fogg v. Blair,* 139 Id. 118; *Clark v. Beaver,* Id. 96; *Handley v. Stutz,* Id. 417.

LONG, J. The bills in these case are filed to enjoin the further prosecution of two actions at law brought by the defendants Miller and Haslett as plaintiffs against the complainant as defendant. In each case the plaintiff sued as assignee of defendant Bancroft.

The complainant is charged as the successor of the Chicago & Northeastern Railroad Company in each action. In the Miller case the action was for moneys expended for the Chicago & Northeastern Railroad Company in building fences, station-houses, freight-houses, water-tanks, semaphores, and for work, labor, and material provided and money paid by Bancroft for that company. In the Haslett case the action was for moneys claimed to be due to Bancroft upon a contract made by Bancroft with the Chicago & Northeastern Railroad Company, by the terms of which Bancroft was to receive $1,000 per mile for right of way furnished by him to said company.

Before the organization of the Chicago & Northeastern Railroad Company, which road extended from the city of Flint to the city of Lansing, a distance of about 50 miles, a railroad had been built and put in operation

from Port Huron to the city of Flint, called the "Port Huron & Lake Michigan Railroad Company." A road had also been built south-westward from Lansing to the state line of Indiana, called the "Peninsular Railroad," and that had been extended westward to Valparaiso, Ind., and was called the "Peninsular Railroad of Indiana." These three railroad companies had been consolidated by agreement between the different companies, and a new consolidated company, called the "Chicago & Lake Huron Railroad Company," was formed. After its consolidation defendant Bancroft became its general manager, and thereafter was appointed receiver of the consolidated company by the circuit court of the United States for the eastern district of Michigan in equity, in a suit wherein the Union Trust Company of New York, in behalf of the bondholders, was complainant, and the Chicago & Lake Huron Railroad Company was defendant. While defendant Bancroft was acting as receiver for that company, whose road extended from Port Huron to Flint and from Lansing to Valparaiso, in the state of Indiana, and on the 12th day of August, 1874, articles of association were filed organizing the Chicago & Northeastern Railroad Company, Mr. Bancroft becoming one of the subscribers to the shares of the capital stock. This last-named company was organized for the purpose of constructing a railroad from the city of Flint to the city of Lansing, in order to make a continuous line from Port Huron westward to Valparaiso. Mr. Bancroft continued in the discharge of his duties as receiver of the Chicago & Lake Huron Railroad Company up to January 21, 1878, before which time the Chicago & Northeastern Railroad had been constructed and put in operation. At the time of the organization of the Chicago & Northeastern Railroad Company Mr. Bancroft subscribed for 100 shares of its capital stock. James M. Turner, Isaac Gale, and

others, of this State, and William R. Bowes, of Indiana,
also became subscribers. The company was organized
under the general railroad laws of this State with a nom-
inal capital of $1,000,000. A board of directors was duly
elected, and it is claimed that $2,500 was paid in, being
the 5 per cent. of the $1,000 per mile required by the
statute.

On the 10th day of November following defendant
Bancroft entered into a contract with the company,
through William R. Bowes, its fiscal agent and secretary,
to construct the railroad from the city of Flint to
the city of Lansing, its entire length. By the terms
of this contract Bancroft was to build complete that
part of the road from Flint to its crossing with the
Detroit & Milwaukee Railroad within one year, and to
complete the balance within two years from that date.
The work was to be done in conformity with the speci-
cations which were annexed to the contract; and in
payment therefor Bancroft was to receive $1,250,000 in
its first-mortgage bonds, and the further sum of $997,-
500 in is common stock, the bonds to be delivered from
time to time as they might be called for by him, and
the stock to be delivered, $600,000 upon the signing of
the contract, and the balance upon the completion of
the road to the city of Lansing. The contract further
provided that, unless the company should procure the
right of way on or before the first day of February fol-
lowing, Bancroft might, at his option, procure the same,
and be paid therefor at the rate of $1,000 per mile in
cash. It was further provided in the contract that Ban-
croft should be entitled to all notes and subscriptions to
capital stock that might have been or might be made by
any party or parties as donations or otherwise, to the
company to aid in the building of said road. The sec-
retary or treasurer of the company, by the terms of the

contract, was to use the corporate name of the company, in indorsements or otherwise, as Bancroft might require from time to time to aid in the purchase of rails or otherwise facilitate the construction of the road. The specifications of this contract, and made a part of it, provided for the usual excavations, embankments, bridges, culverts, rails, ties, cattle-guards, planking of highway crossings, ballasting, and also provided that "the chief engineer shall be sole umpire and arbiter of the character, quality, and quantity of all work done by the contractors, and also the progress of the work and final completion of contracts." The contract and specifications made no provisions for fencing, side tracks, switches, semaphores, water-tanks, station-houses, freight-sheds, nor for any of the appointments required by the general railroad law, without which the road could not be operated.

After the execution of this contract Mr. Bancroft entered into a contract with Clarke Bros. to construct 25 miles of road, commencing at Lansing and extending east, by the terms of which Clarke Bros. were to furnish a large quantity of the iron, for which work and iron they were to receive $125,000 in cash, $130,000 in bankable paper, and $130,000 in first mortgage bonds of the company. These bonds, by the terms of the contract, were accepted by Clarke Bros. at their face value. In this same contract with Clarke Bros. it was contemplated that work not specified would be done under the contract, it being expressly provided that one-fourth of the amount to be paid for extra work should be paid in bonds of the company, fixed at 80 cents on the dollar.

Under these contracts the road was completed about January 1, 1877. Mr. Bancroft, during the time he was engaged in constructing it, received the entire amount of the bonds and the whole amount of stock of

the company, less 25 shares, as provided in the contract, and obtained from Mr. Bowes a certificate, indorsed upon the contract, as fiscal agent of the company, that the road had been completed according to the terms and conditions of the contract. Upon the completion of the road, and during the time of its construction, Mr. Bancroft had pledged or in some manner disposed of a large amount of the stock and bonds of the company to what is known as the "Flint Pool," and to O'Brien J. Atkinson and Edgar White at Port Huron. After the completion of the road under the contract, Mr. Bancroft, still acting as receiver of the Chicago & Lake Huron Railroad, by some arrangement (but with whom made is not very definitely stated in the record) commenced running trains of cars over the entire length of the road from Port Huron to Valparaiso upon an agreement to pay to the Chicago & Northeastern Company, for the use of its road between Flint and Lansing, the sum of $2.50 per car hauled over its road. This arrangement was continued until the 21st day of January, 1878, when James M. Turner, acting for himself and the Flint pool and others who had acquired a majority of the stock and bonds of the Chicago & Northeastern Railroad Company, made an arrangement with Mr. Vanderbilt, of New York, by which Mr. Vanderbilt became the owner of such stock and bonds, and at once assumed control of the road, James M. Turner acting as its president. Subsequently, and in September, 1879, the Vanderbilt interests were conveyed to Sir Joseph Hickson, of the Grand Trunk Railway system, as trustee, and on March 23, 1880, these several lines of road extending from Port Huron to Valparaiso were consolidated under the name of the Chicago & Grand Trunk Railway Company, the complainant in these cases.

Before Mr. Vanderbilt acquired such interest in the

Chicago & Northeastern Company, Mr. Bancroft had erected along the line of the road fences, station-houses, freight-houses, water-tanks, semaphores, etc. It is not claimed that any written contract was ever made between the company and Mr. Bancroft for this work, or in fact that any resolution was adopted by the board of directors directing it to be done; the claim being that the individual members of the board of directors authorized it, and agreed from time to time that payments should be made.

At the time Vanderbilt purchased the stock and bonds, the books of the company did not show any indebtedness for the items claimed in these two suits. Mr. Bancroft did not keep any books showing that the Chicago & Northeastern Railroad Company was indebted to him. He did keep upon his receiver's books a statement of moneys paid out in doing the work for which claim is made in the Miller case, which items were afterwards transferred from such books to other books of his own, and which is simply a statement of moneys paid out, but not appearing on the books as a charge against the company. These books are in evidence, and marked "Exhibits 51, 52, and 53."

Before Mr. Hickson purchased in the interest of the stockholders of the Grand Trunk Railway, Mr. Meddaugh, of Detroit, who was acting for Mr. Hickson, and as the American counsel for the Grand Trunk interest, was referred by Mr. Vanderbilt to James M. Turner, of Lansing, for information respecting the indebtedness of the Chicago & Northeastern road and as to the condition of its right of way. Mr. Meddaugh went to Lansing and had a conference with Mr. Turner, and was there assured by him that the right of way had all been acquired and paid for, and that there was no indebtedness of any kind beyond that embodied in the statements which Mr. Turner

then gave him. These statements are Exhibits 1, 2, and 3. Exhibits 1 and 2 are trial balances of the Chicago & Northeastern Railroad Company, under dates, respectively, of June 30 and July 31, 1879, and Exhibit 3 is a tabular statement of the earnings and expenses of the road for the year ending June 30, 1879, and in no one of them does Bancroft appear as debtor or creditor. This fact is not denied by Mr. Turner. On the contrary, upon his cross-examination, when asked with reference to the indebtedness of the Chicago & Northeastern Railroad, and what he said to Mr. Meddaugh on the occasion of the interview referred to, he stated that he represented to Mr. Meddaugh that the road owed nothing except the bonded and ordinary current indebtedness, and that he gave him the statements in writing above referred to.

It also appears that Mr. Turner, as president of the company for the years 1875, 1876, and 1877, made a sworn statement each year of the financial condition of the road to the Railroad Commissioner of the State, as required by law, in which, for the year 1875, he stated that no unfunded indebtedness had been incurred for the construction, equipment, or purchase of property, and that no debt had been incurred for any other purpose, and that there was no debt then outstanding against the company. In his report for the year 1876 he states the total indebtedness at $1,250,000, which is also stated to be the total amount of the funded debt. He also states that there is no unfunded debt incurred for construction, equipment, or purchase of property, nor for any other special purpose, and that there are no other debts, current credit balances, etc. At page 511 of the report he states, under the head of "Cost of Road and Equipment," that grading and masonry, bridging, superstructure, including rails, land, land damages, and fences, passenger and freight stations, wood-sheds, and water

stations, engine-houses, car-sheds, and turn tables, and all other items charged to construction not enumerated, were paid for by contract for one gross sum, and that the total amount expended for construction was $2,250,-000, which sum was made up by adding the nominal capital stock and bonded debt together; and that the road was completed ready for ballast December 31, 1876. For the year 1877 he reports under the head of "Debt," the total liabilities at $1,250,000, and expressly states that there is no unfunded debt for construction or equipment, real estate, or anything else; and again in that report, under head of "Cost of Road and Equipment," he says that the grading and masonry, bridging, super-structure, including rails, land, land damages, and fences, passenger and freight stations, wood-sheds, and water-stations, engine-houses, car-sheds, and turn-tables, machine-shops, engineering, agencies, salaries, and other expenses during construction, were all paid for by the entire issue of stock and bonds.

It also appears that when Mr. Vanderbilt proposed to purchase the stock and bonds he sent Judge Mason and John Newell to Lansing in his behalf to inquire into the property and its financial situation. They called upon Mr. Turner, as Turner himself testified. They examined the books, as Turner says, and "were there to inspect the property, the financial condition, and standing." At this time, which was in 1878, as has already been stated, the books of the company did not show any indebtedness to Mr. Bancroft; and the three reports had then been made by Mr. Turner to the Railroad Commissioner. It is evident that the agents of Mr. Vanderbilt did not find any other indebtedness than shown on the books, and Mr. Turner admits that he did not tell them of the Bancroft claim. At least their report was satisfactory to

Mr. Vanderbilt; for he at once closed the matter, and took the bonds and stock of Mr. Turner.

The only excuse made, or attempted to be made, by Mr. Turner for these statements to the Commissioner of Railroads and the agents of Mr. Vanderbilt when he purchased, and to the agents of Mr. Hickson when he made his purchase, is contained in a letter subsequently written by him to Mr. Meddaugh, and in his testimony, in which, not denying the representation he had made, he says "he thought that Mr. Meddaugh had Bancroft so thoroughly surrounded that he would never be heard of again;" so that Mr. Vanderbilt and Mr. Hickson, as trustee, seem, from the testimony of Mr. Turner, to have purchased in full confidence that there was no outstanding indebtedness of the company, except in small amounts, aside from the bonded debt, and that entirely covered the cost of construction, and every item contained in the Miller and Haslett accounts. Not one word was ever said to the agents of Mr. Vanderbilt or of Mr. Hickson by Mr. Turner about the Bancroft claim until long after the road went into the hands of the stockholders of the Chicago & Grand Trunk Railway Company; yet, during the existence of the Chicago & Northeastern road as a company, Mr. Turner was its president, and in the sale of its stock and bonds to Vanderbilt represented a majority of the same.

We think the record contains abundant evidence that Mr. Bancroft was cognizant of these facts and of the conduct of Mr. Turner in the premises. Mr. Bancroft's attention, on his cross-examination, was called to the reports made by Mr. Turner to the Railroad Commissioner. He was asked:

"*Q.* Do you know who made those reports?
"*A.* I do not know who made them.

"*Q.* Did you know of their being made at the time of their being made?

"*A.* Yes, sir.

"*Q.* You remember of the fact of seeing them at the time of their being made?

"*A.* I presume, in the ordinary course of business, I saw them and knew of them; but, as to recollecting the time and place I saw them, I could not do it.

"*Q.* Then all you can say is, at the time when they were made you knew of their being made, and knew what they contained at that time?

"*A.* I must have known so; yes, sir."

By his own admission Mr. Bancroft knew that Mr. Turner, as president of the company, had made sworn reports to the Railroad Commissioner, stating that the construction account had all been paid for by the entire issue of stock and bonds, and that this indebtedness included the value of the land, land damages, fences, passenger and freight stations, water-tanks, engine-houses, etc., and which would include every item of the claim made in the two suits at law by Miller and Haslett.

Sir Joseph Hickson, president of the Grand Trunk Railway Company of Canada, testifies that in September, 1877, he looked into the books of the Chicago & Northeastern Company and found that no claims were there recorded in favor of Mr. Bancroft, and that prior to that time he had received assurances from Mr. Bancroft, on various occasions, that there were, with some insignificant exceptions, no outstanding liabilities of the company, and that these assurances were confirmed by an examination of the books of the company; that he purchased the stock and bonds of that company on behalf of the stockholders of the Grand Trunk Railway Company of Canada; and that before the purchase Mr. Meddaugh had reported to him that he had received assurances that the title to the right of way was perfect. The interview between Sir Joseph Hicks and Mr. Ban-

croft about the affairs of the company seems to have grown out of a proposed sale by Mr. Bancroft of the stock and bonds of the company directly to Mr. Hickson and the Grand Trunk people before Mr. Vanderbilt purchased. This was called the "Amsterdam Agreement," which is in writing, and introduced in evidence. The agreement fell through, and the sale was finally made by Mr. Turner to Mr. Vanderbilt, instead of by Mr. Bancroft to the Grand Trunk Railway. During the negotiations in 1877 for the sale under the Amsterdam agreement, Mr. John Bell, the general counsel for the Grand Trunk Railway Company of Canada, had a conversation with Mr. Bancroft, in which he testifies that he was told by Mr. Bancroft that the right of way for the Chicago &. Northeastern road had been paid for, and that there were no claims existing against it. He also testifies that he remembers distinctly of Sir Joseph Hickson particularly inquiring of Mr. Bancroft what liabilities there were against the Chicago & Northeastern Railroad Company, as he was anxious to know the exact condition; and upon every occasion, in his hearing, Mr. Bancroft did not make any claim that the company was indebted to him in any manner. Mr. Bancroft, in his direct examination, claimed that Sir Joseph Hickson, and the people in whose interest he was making the purchase under the Amsterdam agreement, knew that he had claims against the company; but on his cross-examination he admits that no claim was made for the right of way, and that no other claims were specifically mentioned.

We find, then, Mr. Bancroft and Mr. Turner, prior to these purchases, both making representations that there was no indebtedness against the Chicago & Northeastern Railroad Company, except a small amount for current expenses, etc., and that the right of way, and every other

item claimed for in the two suits, had been fully paid for by the entire issue of stock and bonds.

It is contended upon the part of the complainant,—

1. That William L. Bancroft organized the Chicago & Northeastern Railroad Company, not for the purpose of building and operating the railroad as contemplated by the general railroad law, but for the sole purpose of enabling him, said Bancroft, to construct a road between Flint and Lansing under cover of the corporate organization known as the "Chicago & Northeastern Railroad Company;" that no one contributed a dollar to its capital stock, and that the corporation existed merely on paper; that the corporation and Bancroft were one and the same, and what purported on its face to be a contract between the corporation and Bancroft was in fact a contract by William L. Bancroft with himself.

2. That William L. Bancroft organized the Chicago & Northeastern Railroad Company in fraud of the statutes of the State; that the alleged contract or contracts, under which he claims, were made in furtherance of the fraudulent scheme, and are therefore tainted with it, and void.

3. That the contract in the Haslett case is void on its face, because contrary to public policy.

4. That the construction of the road did not cost to exceed $700,000, and the complainant is entitled to have Bancroft account to it for the stock and bonds issued to him at their par value, and to have a decree against him for the payment of the amount thereof, less the actual sum expended by him in the construction of the road.

5. That Bancroft knew of the sale of the stock and bonds by Turner to Vanderbilt, and made no objections to the sale, but consented to the sale, and aided in making it, without disclosing to Vanderbilt, or to any one acting for him, that he (Bancroft) had any claim for the right of way, or had any other claim against the company; that he knew of the proceedings for consolidation, and gave no notice of such claim; that the shareholders in the several consolidating companies surrendered their shares, taking therefor shares in the complainant company, and at that time the books of the Chicago and Northeastern Company did not show any indebtedness to Bancroft either for right of way or for any other of the claims sued for in the two suits at law;

that the stock and bonds received by Bancroft subsequently passed into the hands of *bona fide* purchasers in good faith for value; that all of the bonds except $35,000 have since been retired by the complainant company at the full face value thereof, and accrued interest, and said stock, at the time of the consolidation, was believed to be and was treated as fully-paid-up stock, and new non-assessable stock of the complainant was issued to the holders thereof in like amount, share for share, which has since been transferred to other holders, who have bought in good faith for value.

It is undoubtedly well settled that parties who deal with a corporation *de facto* cannot collaterally deny the legality of the corporate existence. By dealing with such company they are held to admit that it is a corporation, and the question of the legality of its organization is a question which is to be raised only by direct proceedings therefor in behalf of the State; but it does not follow that one who deals with it as such, under the circumstances here stated, shall be precluded from showing that the organization of the company was brought about for the very purpose of perpetrating a fraud under cover of ·it.

Morawetz on Corporations (section 1) says:

"It is essential to a clear understanding of many important branches of the law of corporations to bear in mind distinctly that the existence of a corporation, independently of its shareholders, is a fiction; and that the rights and duties of an incorporated association are in reality the rights and duties of the persons who oppose it, and not of an imaginary being."

At section 227, he says:

"In equity the conception of a corporate entity is used merely as a formula for working out the rights and equities of the real parties in interest, while at law this figurative conception takes the shape of a dogma, and is often applied rigorously, without regard to its true purpose and meaning. In equity the relationship between

the shareholders is recognized whenever this becomes necessary to the attainment of justice; at law this relationship is not. recognized at all."

In *Gas Co. v. West*, 50 Iowa, 16, 25, it is said:

" Equity will not be bound by the technical rules of the law when these rules will permit fraud to triumph. The legal rules which regard a corporation as an artificial person, to be bound only by acts done in accord with its charter, which permit it to hold property as a natural person, and limit the interest of the stockholder therein to his shares, must all go down when they are attempted to be used as instruments of fraud by the dishonest, and stand in the way of equity."[1]

By the statute permitting consolidations (How. Stat. § 3344), it is provided that—

"All and singular the rights and franchises of each and all of said two or more corporations, parties to such agreement, and all and singular their rights and interests in and to every species of property and things in action, shall be deemed to be transferred to and vested in such new corporation, without any other deed or transfer; and such new corporation shall hold and enjoy the same, together with all the right of way and all other rights of property, in the same manner and to the same intent as if the said two or more corporations, parties to such agreement, should have continued to retain the title and transact the business of such corporation;    *    *    * that all the debts, liabilities, and duties of either company shall thenceforth attach to such new corporation, and be enforced against the same to the same extent and in the same manner as if such debts, liabilities, and duties had been originally incurred by it."

Under the proofs in this case it is apparent that Mr. Bancroft was the company. He paid all that was paid in its organization, and then entered into a contract by which he took all its bonds and all the stock that was ever issued, which was the whole amount of stock, less 25 shares. The contract which he pretended to enter into with the company through Mr. Bowes, as its fiscal

---

[1] Above authorities were cited by counsel for complainant.

agent, was in fact a contract by himself of the one part, with a corporation of the other part of which he was the sole owner of all of its stock; and by the terms of the contract he took all that the company had. If this contract had been enforced it could not but operate as a gross fraud upon the company, if such a company actually existed except upon paper.

The whole scheme of the organization is patent. Mr. Bancroft was receiver of the other companies, and to make a through line from Port Huron to Valparaiso, and thence to Chicago, the line from Flint to Lansing must be built. He conceived the idea of building that link, and for that purpose organized the Chicago & Northeastern Company, keeping the organization in his own hands, and making a contract by which he should get all it had, bond it for $25,000 a mile, and then consolidate it with the other companies for a through line by replacing its bonds by the bonds of the consolidated company. The Amsterdam agreement shows that it was his intention to take advantage of the exigencies of the other companies, and in that way to replace the bonds which he held of the Chicago & Northeastern Company. Under the contract he left nothing in the hands of the company by which it, as a corporation, could complete its road. The road which he was to build by the terms of the contract was not one which, under the statute, could be operated. It had no side tracks, turn-tables, station-houses, water-tanks, semaphores, fences, etc., necessary to operate the road, and not a foot of the right of way secured when the contract was entered into, and not a dollar in the treasury or a single bond to purchase the same with, no rolling stock even being provided for. He took all the company had, and now contends that the company is bound to pay him $1,000 per mile for securing the right of way, and for side tracks, water-

tanks, station-houses, etc., for the building of which his contract did not provide. Under the statute authorizing the consolidation, the complainant company could, in any event, only be made liable if the Chicago & Northeastern Company could be so held.

I think the proofs show clearly:

1. That the whole scheme was intended as a fraud upon the statute authorizing` the organization of railroad companies.

2. That the complainant company is not estopped from inquiring into it, under the circumstances of this case, for the reason that the indebtedness upon the claims now made was not known either to the Vanderbilt interest or the Grand Trunk interest at the time of their respective purchases of the bonds and stock of the company; and no such claim was made by Mr. Bancroft at or before the time of the consolidation of the Northeastern Company with the Chicago & Lake Huron Company, under the name of the Chicago & Grand Trunk Railway Company, the complainant in these cases.

3. It is also apparent that in equity Mr. Bancroft has been more than paid for all the labor and money expended by him, including the claims now made for right of way and the items involved in the Miller case. By the terms of the contract Bancroft was to receive the bonds whenever he called for them. The contract was executed November 10, 1874, but he did nothing under it until about the time he entered into a contract with Clarke Bros., June 10, 1876, though he was to commence at once, and construct and complete the road from Flint to the crossing of the Detroit, Grand Haven & Milwaukee road at Durand within one year. The Clarke Brothers, under their contract, were to construct 25 miles of road, commencing at Lansing, extending east, and to furnish a large quantity of iron, for which work and iron to be

furnished they were to receive $385,000, and of which $130,000 was to be in first-mortgage bonds of the company at their face value. In the same contract with Clarke Bros. it was contemplated that work not specified therein would be done, and it was provided that one-quarter of this extra work by them should be paid for in bonds at 80 cents on a dollar. This shows that the bonds, at that time, were regarded as having some considerable value. It is also apparent from the answer of Mr. Bancroft in this case, and to which answer the other defendants refer in their answers, that these bonds were worth at least 50 cents on a dollar at that time. In paragraph 9 of his answer Mr. Bancroft says that—

"The market value of bonds on such a road was not over 50 per cent. of their face value, while the value of the stock was merely nominal, and that defendant, in his estimate for the building of said road, so valued said bonds and stock, and that such a valuation was a reasonable and proper one, as compared with similar railroad undertakings, and as may be shown by an examination of price-lists of ordinary railr.ad securities, and in fact the complainant, or persons who acquired said bonds and stock for it, paid therefor, after the completion of said road, only 50 cents on the dollar of said bonds, allowing nothing to said Vanderbilt for a majority of its said stock."

It is admitted, therefore, by the answer that the bonds, at the time they went into Bancroft's hands, were worth 50 cents on a dollar, or $625,000, and these bonds, in addition to the stock, $997,500 at its face value, went into Mr. Bancroft's hands. A showing is made of the cost and expenses of construction of the road by Mr. Bancroft in the present suits by Exhibit 55, produced by him. The total expenditure is stated at $587,148.53. Afterwards he produced another statement, called "Exhibit 54," made up apparently of the same items as the other exhibit, and with some other items added at the

bottom, making the sum total in that exhibit for the cost of construction of the road, including the Miller and Haslett claims sued upon, at $608,426.30. In this last exhibit is added the sum of $10,472.50, for right of way, to "sundry persons." This is over and above the $1,000 a mile provided for in the contract; so that in any event, without placing any value whatever upon the stock transferred to him, considering only the amount which he received from the sale of the bonds, and placing the bonds at their value admitted in his answer, he has received several thousand dollars more than all moneys expended by him, including the Miller and Haslett claims. If we calculate the value of the bonds at the prices agreed upon in the Clarke contract, and what Bancroft received for the bonds turned out to Mr. Atkinson and the Flint pool, it would show a still greater amount coming into his hands from the sale of the bonds. Equitably, therefore, Mr. Bancroft is not in a position to insist upon the payment of these claims, and defendants Miller and Haslett stand in no better position than Mr. Bancroft.

4. We think the defendants should be estopped from prosecuting their claims against the complainant company in the suits at law by reason of the representations made by Mr. Turner, and of which Bancroft must have been fully cognizant, and by reason of the representations made by Mr. Bancroft to Mr. Hickson and others, that there was no such indebtedness as here claimed existing against the Chicago & Northeastern Railroad Company. The stockholders of the complainant company apparently purchased in good faith, and without any knowledge or notice of these claims, and after an examination of the books of the company, and upon representations by Mr. Turner that no such indebtedness existed, and after repeated assurances by Mr. Bancroft to Mr. Hickson and others that the right of way was fully paid for, and that

there was no indebtedness against the company except for current expenses.

The court below found that the bringing of the two suits at law was against equity and good conscience, and that the suits ought not further to be prosecuted or maintained. Writs of injunction were issued out of that court perpetually prohibiting the parties from further proceeding in both suits.

These decrees of the court below must be affirmed, with costs.

The other Justices concurred.