### Aurora Daily News Company et al., Appellees, v. Lincoln B. Frazier, Appellant.

#### Gen. No. 5368.

INJUNCTION—*when lies to restrain prosecution of action at law upon note.* An injunction lies to restrain the prosecution of an action at law upon a promissory note made by a corporation as to which such corporation has no defense at law, but as to which there is an equitable defense in favor of the sole owners of such corporation, which defense is one of fraud in the consideration.

Bill in chancery. Appeal from the Circuit Court of Kane county; the Hon. DUANE J. CARNES, Judge, presiding. Heard in this court at the April term, 1910. Affirmed. Opinion filed October 18, 1910.

JOHN M. RAYMOND and JOHN K. NEWHALL, for appellant.

DAVID J. PEFFERS, for appellees; ALBERT J. HOPKINS, *pro se.*

MR. JUSTICE DIBELL delivered the opinion of the court.

The Aurora Daily News Company, an Illinois corporation, hereinafter called the Company, Albert J. Hopkins and Charles H. Smith, filed a bill in equity against Lincoln B. Frazier. One object of the bill was to secure an injunction against the further prosecution of a suit brought by Frazier against the company on January 27, 1910, in the Circuit Court of Kane county upon a promissory note dated September 2, 1909, payable on demand after date with interest at six per cent per annum, for the principal sum of $2,500, purporting to be executed by the company by Frazier, its presi-

dent, to the Aurora National Bank, and by the latter endorsed to the order of Frazier without recourse. A motion by complainants for a temporary injunction was submitted by complainants upon the bill of complaint verified by the affidavit of Hopkins; by the defendant, Frazier, upon his affidavit, certain exhibits and the oral evidence of M. E. Plain, secretary of the company, identifying certain records of the company which defendant put in evidence; in rebuttal of which complainants read additional affidavits of Plain and Hopkins and the affidavits of W. W. Clark, then the managing editor, and of one of the expert accountants hereinafter mentioned. It was shown that complainant, Smith, was too ill to make an affidavit. The court granted a temporary injunction upon the giving of a certain bond, which bond was furnished. Frazier prosecutes this appeal from the order granting the injunction. Frazier's affidavit admitted many things stated in the bill, denied some, was silent as to some, and gave a different version of others. We are not called upon to determine how far, upon an application for injunction before answer, the affidavit of the defendant denying the allegations of the bill can be heard to prevent a temporary injunction, for the reason that when all the affidavits are considered there is a clear preponderance of proof in favor of most of the material allegations of the bill. The main question is whether a case is stated which entitles complainants to a temporary injunction, or whether complainants have an adequate remedy at law and for that reason cannot resort to equity.

The bill alleged that the company was an Illinois corporation, organized about 1891 and having its principal place of business in Aurora; that its capital stock had been issued, and in 1908 was all owned by Frazier, except two shares delivered by Frazier to an employe named Douglas under an arrangement that when Douglas ceased to be an employe of the company Frazier should have the right to purchase said two shares for $213; that Douglas long prior to October, 1908, had ceased to be an employe and Frazier claimed to own those two shares; and also, that in October, 1908, and for many

years prior thereto Frazier owned ninety-eight out of the one hundred shares of the capital stock and claimed to own said other two shares; that the business of the company was the publication of a daily newspaper in Aurora; that for many years prior to October, 1908, the corporate form of the business was disregarded and it was treated as the individual business of Frazier; that Frazier and his wife and a relative were a majority of the board of directors, but the property and business, though technically that of the company, was treated as the property and business of Frazier and he conducted the business as though it were not owned by a corporation but was his private property, and the shares of stock were treated by him as evidence of his ownership of the assets of the company; that, on October 31, 1908, while still the owner of the entire stock and holding and treating the same as above stated, Frazier sold Smith and Hopkins a one-half interest in the property and assets of the company for a valuable consideration; that in the negotiation and sale thereof Frazier treated said business and property as belonging to him, although in transferring said one-half interest he assigned twenty-five shares of said stock to Hopkins and a like number to Smith.

The bill further alleged that in negotiating said sale Frazier stated to both Smith and Hopkins, in answer to their questions, that the company was a going concern, that it had no debts, and that at that time and long prior thereto Frazier had been and was making money in said business; that Hopkins and Smith both relied upon the truth of said representations in purchasing said interest in the business; that thereafter Frazier continued to manage the business till September 25, 1909; that Smith and Hopkins had confidence in the honesty of Frazier and trusted him with the management of the business, but did not authorize him to execute promissory notes or power of attorney upon which a judgment could be rendered against the company, and they each relied upon the statements of Frazier that the income of the company from month to month was greater than its necessary expenditures; that the books and accounts of the business for

many years before Hopkins and Smith bought said interest and thereafter until about September 25, 1909, were under the sole supervision of Frazier and he was in sole control of all contracts and documents relating to the income and expenditures of the company; that from time to time between October 31, 1908, and September 25, 1909, Frazier reported to Hopkins and Smith that the company was making more money than was expended from month to month.

The bill further alleged that during the summer of 1909 Frazier sought to sell his remaining interest in the company to Hopkins in order that Frazier might go out of the newspaper business and devote his time to his duties as trustee of his father's estate, and negotiations were carried on during the summer and fall of 1909 between Frazier and Hopkins for the sale by Frazier to Hopkins of Frazier's remaining one-half interest in said property and business, during which negotiations Frazier always stated that the business of the company was being conducted with profit; that during these negotiations it was arranged between Hopkins and Frazier, at the instance of Hopkins, that expert accountants should examine the books and accounts of the business, and two expert accountants did so; that Frazier furnished to said accountants access to the books, papers and documents of the company, which were then under the sole supervision and control of Frazier; that upon the information and data furnished by Frazier, said accountants made a report showing that the assets exceeded the liabilities by nearly $2,000 and showing that there were only $497.29 of unpaid bills and accounts and an unpaid note of $1,000 held by the First National Bank of Aurora, and that the unpaid subscriptions, advertising and cash exceeded the liabilities by $1,913.04; that Frazier personally examined said report after it was made and stated to Hopkins that it correctly represented the financial condition of the company and business so far as liabilities were concerned, and that there were unpaid subscriptions, aggregating nearly $1,900, which should be added to the assets of the company; that during the time from October 31, 1908, to September 25, 1909, though the business

was technically conducted by the corporation, it was treated as the individual business of Frazier, Hopkins and Smith, Frazier owning one-half and Smith and Hopkins each one-fourth of the said business.

The bill further alleged that on September 25, 1909, Frazier sold his remaining one-half interest in the property and assets of the business to Hopkins for a valuable consideration; that in said sale said one-half interest in said property was treated as belonging to Frazier; that though Frazier then assigned the remaining shares of stock in the company to Hopkins, yet this was merely as a convenient way of making the transfer; that Hopkins in buying said remaining interest in the business from Frazier did so in reliance upon Frazier's statements to him as to the financial condition of the company and business, and upon Frazier's statement of the correctness of the report of said accountants and upon the statement made to Hopkins by Frazier before and at the time of the purchase that no new or other indebtedness had been created and no new obligation had been made, and relying thereon, Hopkins paid Frazier for said remaining interest in the business.

The bill further alleged the commencement by Frazier of said suit against the company upon said note for $2,500 above described; that when Hopkins bought said remaining interest in the business from Frazier he had no knowledge of the existence of said promissory note or that any such indebtedness existed, and first learned thereof about November 9, 1909, long after he had paid Frazier for such remaining interest; that though said note was negotiated by Frazier at said Aurora National Bank on September 2, 1909, and though Hopkins and Frazier talked over the financial condition and indebtedness of the company and said accountants' report between September 2 and September 25, 1909, yet Frazier concealed from Hopkins the facts concerning the execution and negotiation of said note and stated to Hopkins that no new or additional indebtedness had been created since the examination by said accountants, which was on August 10, 1909; that Frazier now claims that said note was made for old debts of the company, but he did not advise said ac-

countants of any such indebtedness, and the books, accounts
and papers of the company contain no entry of the existence
thereof; that the company carried on its banking business
with the First National Bank of Aurora and had never car-
ried on any business with Aurora National Bank, and that
Frazier negotiated said note at the latter bank to prevent
knowledge thereof coming to Hopkins or Smith or the com-
pany; that Frazier never caused any entry to be made on
the books of the company of said transaction with the Aurora
National Bank; that Smith and the company had no knowl-
edge or information of any indebtedness of the company, ex-
cept as set forth in the report of said accountants, and no
knowledge of the making of this note, and that Frazier had
no authority to execute the note and power of attorney there-
to attached; that when they learned of the note Smith and
Hopkins repudiated it and insisted that it was the indebted-
ness of Frazier; that thereupon Frazier paid the note and
took it up and instituted this suit in his own name against
the company; that said suit at law is an attempt to recover
said indebtedness against said Hopkins and Smith and that
if said note should go to judgment in said suit it would be
in effect a recovery against Smith and Hopkins in proportion
to their respective interests in the property, and that it is
inequitable and unjust that Frazier should prosecute said
suit against said company, and that the equitable defenses
herein shown cannot be availed of in said suit at law.

The bill further alleged that after Hopkins purchased said
remaining interest of Frazier on September 25, 1909, a
large number of bills and accounts were presented against
the company which were outstanding when said accountants
examined said books and which were not shown upon the
books, and the existence of which was concealed from the
complainants, and Frazier did not tell the accountants nor
Hopkins thereof; that said debts and liabilities so concealed
amounted to $6,000; that the company was compelled to pay
them and they depreciated the value of the interest so pur-
chased by Smith and Hopkins from Frazier; that in equity
Frazier is estopped from denying his liability to pay said

claims as well as said note, and that by his silence concerning said liabilities and his assurances above stated and by his conduct when he sold his interest in the company he in law assumed to pay all indebtedness not stated in the report of the accountants and ought in equity to be decreed to reimburse the company or Hopkins or Smith for the payment of said sums of money; that when they bought the interest on October 31, 1908, Frazier agreed with them to keep accurate books of account of said business and show the receipts and expenditures thereon from day to day; that Hopkins and Smith were engaged in other occupations and relied upon Frazier to keep accurate books of account and to show the receipts and liabilities of the company, but that he did not perform his agreement but received large sums of money, amounting to over $8,000, belonging to the company and in which Smith and Hopkins were interested, which he diverted to his own use and did not enter upon the books of account. The averments of the bill were much more full than we have above stated. The bill prayed for an accounting between complainants and Frazier, and that Frazier be decreed to pay complainants whatever was due from him to the complainants or any of them upon such accounting, and they offered to pay Frazier what, if anything, should be due from them to him; and the bill prayed for a temporary injunction against the prosecution of said suit at law, and that upon the final hearing such injunction be made perpetual, and for other and further relief.

Frazier in his affidavit stated that he only owned ninety-five shares; that three shares had never been issued, and that two shares had been issued to Douglas, who had assigned the same to I. C. Copley, and that the latter claimed to own said two shares; and that there was pending in the circuit court a *mandamus* suit brought by Douglas and Copley against the company and Frazier, its then president, and Plain, its secretary, to compel the transfer of said stock from Douglas to Copley on the books of the company. But Frazier also intoduced in evidence the answer of the company and of Frazier and of Plain to said petition for a *mandamus*, where-

in they stated that the delivery of said certificate to Douglas was a gratuity on the part of the company and its president, and that said certificate stated that it was issued to Douglas, not in his individual right, but as an employe of the company, and that if Douglas should cease to be an employe of the company, the president should have the option to take back said shares of stock on paying six per cent premium on the par value of the same, and that the stock could not be transferred to any other person than one first approved by the board of directors. Said answer in the *mandamus* case further stated that Douglas had left the employ of the company and entered the service of a rival newspaper, and that Frazier as president of the company had exercised the option to take back said shares from Douglas and had paid him therefor its par value and the six per cent premium, and that said shares thereby became the property of the president, and Douglas had no further interest therein and no power to transfer said shares to Copley, and that said alleged transfer to Copley was void and gave Copley no right to said shares. Frazier also offered in evidence the records of the company, and among them certain by-laws which allowed the transfer of shares of stock only to some person first approved by the board of directors; and which provided that where shares were held by an employe of the company, the president at his option should have the right to buy such shares upon the termination of employment at the price which the employe paid therefor. If three shares had not been issued there were in fact but ninety-seven shares. Upon this application for a temporary injunction it must be considered as established that when Frazier negotiated for the first sale to Hopkins and Smith he represented himself to be the sole owner of the business and property of the company. He claims in his affidavit that what he negotiated and sold to Hopkins and Smith in 1908 and to Hopkins in 1909 was shares of stock in the company; but not only does the sworn bill allege a very different state of facts, but also Plain in his affidavit in rebuttal states that in 1908 Frazier sought for and obtained his services to interest Hopkins and Smith

in the business and to induce them to buy a one-half interest, and that he did so act and did bring about the first sale, and that nothing was said to him by Frazier about selling any shares of stock nor were the value of such shares of stock stated or discussed, but that Frazier treated it as a business and property owned by him and that he wished to sell a one-half interest in said business and property to Hopkins and Smith; that in 1909 Frazier again sought his assistance to sell his remaining interest in the property to Hopkins and that he did assist in such sale, and that there was then no discussion of the capital stock but only of his remaining interest in the business and property. If the record of the company introduced in evidence is the entire record of the meetings of the stockholders and of the board of directors, then it is evident that the corporate existence and control had always been a mere matter of form during the legal existence of the corporation. Some times such meetings were held once, twice or three times a year. Sometimes they were two years apart and once, between three and four years. Several meetings were held just before and just after the purchase of the one-half interest by Hopkins and Smith in 1908 so as to give Hopkins and Smith representatives on the board of directors. Thereafter, while Frazier managed the business for all three, no corporate meetings were held, and the proof is that when Frazier desired advice or assistance he did not apply to the board of directors, but to Hopkins and Smith.

Frazier stated in his affidavit that he used the proceeds of the $2,500 note partly to pay former debts of the company and that the rest was put into the treasury of the company. He does not state the amounts or the names of the owners of such former debts so paid, nor when they were incurred. He does not deny that he borrowed this money and gave this note after the expert accountants had made their report and when the negotiations for the sale of his remaining interest were far advanced. He does not deny that he procured the loan at a bank with which the company had not previously done business. He does not deny that he

failed to have the transaction entered on the books of the company and that he failed to tell Hopkins anything about it.   His affidavit gives no reason why he went to a strange bank, why he did not cause the transaction to be entered on the books, and does not explain why he failed to tell Hopkins about this new outstanding obligation of the company.   His conduct and his silence when he should have spoken raised an unfavorable inference against him.   His affidavit shows that Hopkins and Smith each paid him $15,000 for the interest bought at the first purchase, and that Hopkins paid him $10,000 for the interest bought at the second purchase, so that he has received $40,000 in cash for what he sold.   It is obvious that if the allegations of the bill are true, Frazier defrauded Hopkins in the sale to him of the last one-half interest in the business.   If the debts so paid by the proceeds of said $2,500 note were incurred before the purchase of the first one-half interest, then both Hopkins and Smith were defrauded.   So too, the existence of a large amount of indebtedness not shown upon the books was a fraud, either upon Hopkins alone, or upon Hopkins and Smith, if the allegations of the bill are true.   If the business had not been in a corporate form and Frazier were suing Hopkins and Smith, and the other facts stated in the bill were true, then either Hopkins and Smith, by recoupment or by set-off, could have complete relief in the suit at law brought by Frazier, or equity would take jurisdiction and give them relief.   But, because of the corporate form under which the business was nominally conducted, it is contended that the corporation must pay this note in suit at law where Hopkins and Smith, the sole owners of the corporation, cannot be heard to set up these defenses, and that Hopkins and Smith must be left to seek relief against Frazier in one or more actions for deceit.   It is obvious that, under the facts alleged, this would be a serious injustice to Hopkins and Smith.   We are of opinion that in view of the allegations of the bill as to the manner in which the business was in fact conducted and as to the sale by Frazier of the property and business, the corporate form ought not to be

permitted to operate to protect this apparent fraud, under the principles laid down in Donovan v. Purtell, 216 Ill. 629; Chicago & Grand Trunk Ry. Co. v. Miller, 91 Mich. 166; Des Moines Gas Co. v. West, 50 Iowa 16, 25; Jones v. Bolles, 9 Wall. 364; and Given v. Times-Republican Ptg. Co., 114 Fed. R. 92, which decision the Supreme Court virtually approved by denying a petition for a writ of *certiorari* therein in 189 U. S. 513. In Donovan v. Purtell, *supra,* our Supreme Court quoted with approval from First National Bank v. Trebein, 59 Ohio St. 316, where that court held that the fiction that a corporation exists apart from the individuals composing it has been repudiated by the courts in all cases where it has been insisted on as a protection to fraud or any other illegal transaction. In Chicago & Grand Trunk Railway Co. v. Miller, *supra,* the railway company brought suit in equity to restrain two suits at law against it brought upon claims assigned to the plaintiffs in said suits by one Bancroft. The Supreme Court of Michigan held that the bringing of the suits at law was against equity and good conscience and that they were properly enjoined, and in so holding said: "The stockholders of the complainant company apparently purchased in good faith, and without any knowledge or notice of these claims, and after examination of the books of the company, and upon representation by Mr. Turner that no such indebtedness existed, and after repeated assurance by Mr. Bancroft to Mr. Hickson and others that the right of way was fully paid for, and that there was no indebtedness against the company except for current expenses." In Des Moines Gas Co. v. West, *supra,* the Supreme Court of Iowa thus stated the principle under consideration: "The legal rules which regard a corporation as an artificial person, to be bound only by acts done in accord with its character, which permit it to hold property as a natural person, and limit the interest of the stockholder therein to his shares, must all go down when they are attempted to be used as instruments of fraud by the dishonest, and stand in the way of equity." In Given v. Times-Republican Printing Co., *supra,* a suit in

equity brought by the corporation and the owner of all its shares of stock against the former owner of said shares to restrain a suit at law brought by the latter against the corporation upon claims which he had concealed when he sold the shares, the court said: "The acts of Given in the management of the business of this corporation, in the treatment of his account with it, and in the preparation of the statement of its resources and liabilities for the purpose of making a sale, without including therein any statement of his account, and his silence concerning any indebtedness of the printing company to him during his negotiations with McFarland, when it was his duty to speak out and give warning of his unknown notes and his concealed claim, were well calculated to lead a reasonably prudent man to believe that the corporation owed him no debt or obligation. The evidence is convincing that McFarland was induced by these acts and this silence to entertain this belief, that Given intended that his acts and silence should have this effect, and that, in the absence of this belief, McFarland would never have paid or agreed to pay the sum of $19,000 for this stock. Here is every element of an equitable estoppel. McFarland has acted on the belief which Given intentionally induced him to form, and he cannot now be permitted to deny its correctness, and to mulct him in the sum of more than $8,000 because he relied on his acts and his silence." In Jones v. Bolles, *supra*, a similar case, the Supreme Court of the United States said: "It is objected that a court of equity has no jurisdiction of the case because the law affords a complete remedy in damages. This objection is groundless. Equity has always had jurisdiction of fraud, misrepresentation and concealment; and it does not depend on discovery." As Smith will be interested in the litigation if the debts which Frazier alleges that he paid with the proceeds of said $2,500 note were incurred before he purchased, and as the company is interested in preventing its property from being taken on execution under a judgment which Frazier ought not to be permitted to collect if the averments of the bill are true, there is no impropriety in all

the complainants joining in the bill. We are of opinion that the court did not err in granting the temporary injunction. Of course, we are only considering *ex parte* affidavits. It may be that the examination and cross-examination of witnesses will give the case a different aspect. We are not called upon to determine now whether, if the bill is sustained by the proofs, Frazier should be enjoined from collecting any part of the note or only a certain proportion thereof, nor what relief will be required concerning said other debts of the company not appearing on its books.

The order is affirmed.

*Affirmed.*